559 F.2d 1019
 TEXAS ACORN, Dini Turley, et al., Plaintiffs-Appellees,
v.
TEXAS AREA 5 HEALTH SYSTEMS AGENCY, INC., Defendant-Appellant,
Joseph Califano, as Secretary, United States Department of
Health, Education and Welfare, Defendant-Appellant,
Floyd A. Norman, M. D., as Regional Health Administrator,
Public Health Service, etc., Defendant.
 No. 77-1717.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 23, 1977.
 
 Jerry Lee Hughes, Dennis R. Swift, Fort Worth, Tex., Roby Hadden, U.S. Atty., Otis W. Carroll, Jr., Asst. U.S. Atty., Tyler, Tex., Henry L. Gilliam, U.S. Dept. of Health, Education & Welfare, Dallas, Tex., William Kanter, Atty., Paul Blankenstein, Atty., Harry R. Silver, Atty., Civil Div., Appellate Sect., Dept. of Justice, Washington, D.C., for defendants-appellants.
 Carl M. Weisbrod, Dallas Legal Services Foundation, Inc., Dallas, Tex., Herbert Semmel Center for Law and Social Policy, Marilyn G. Rose, Washington, D.C., for plaintiffs-appellees.
 William D. Wells, NAACP, New York City, J. Francis Pohlhaus, NAACP, Washington, D.C., for amicus curiae.
 Appeal from the United States District Court for the Eastern District of Texas.
 Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Questions striking at the heart of this nation's health planning policy and health resources development permeate this litigation. Plaintiffs, nine individuals and one unincorporated association (Texas Acorn), gainsay the legality of a Health Systems Agency charged by the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k, et seq., with improving the health of area residents, increasing the accessibility to health services, restraining increases in cost, and preventing unnecessary duplication of health resources. 42 U.S.C. § 300l -2. The District Court agreed that the Board of Directors and Executive Committee of the Texas Area 5 Health Systems Agency do not adequately represent the social and economic population of Texas Area 5 because the consumer representation includes an insufficient number of persons with annual family incomes below $10,000. He granted a partial summary judgment for plaintiffs, and enjoined the Health Systems Agency (HSA) from operating. We reverse and remand for a full evidentiary hearing.
 
 
 2
 Congress enacted the National Health Planning and Resources Development Act of 1974 (Planning Act)[1] after recognizing several problems with regard to health services in this country, including inflationary increases in their cost and unequal access. Further, the lack of a comprehensive approach to the problem was exacerbating the maldistribution and unnecessary duplication of services already approaching the crisis stage. See 42 U.S.C. § 300k(a). The Act requires the Secretary of the Department of Health, Education and Welfare (HEW) to create health service areas, essentially geographic regions, throughout the United States. 42 U.S.C. 300l. The Secretary has designated twelve of these areas in Texas, over 200 throughout the nation. Texas Area 5 consists of nineteen counties in the north central part of that state, centering on the Dallas-Fort Worth Region and covering more than 15,000 square miles containing over 3,000,000 people. On September 21, 1976, the Secretary designated defendant, Texas Area 5 Health Systems Agency, Inc., the health systems agency for Texas Area 5, following a struggle between competing entities.[2]
 
 
 3
 As the statute mandates, health services consumers and providers comprise the Board of Directors and Executive Committee of the HSA. 42 U.S.C. § 300l -1(b) (3)(C). The parties agree, and the District Court found, that approximately 41 of the Board members were consumers, while approximately 38 were providers. The median family income for Texas Area 5 is approximately $10,000 and three of the 41 consumer members had family incomes below that figure. The Executive Committee also maintains the required consumer majority, 51%-60%, with 13 consumers and 12 providers. Two of the 13 consumers on the Committee had family incomes under $10,000.
 
 
 4
 Confronted by these statistics, plaintiffs, all health services consumers, sought declaratory, mandatory, and injunctive relief in the U.S. District Court for the Eastern District of Texas against the Texas Area 5 HSA and HEW. The gravamen of their complaint was the alleged failure of the HSA's Board to include a sufficiently large number of consumers with incomes below $10,000, and thus its neglect of the statutory mandate to be "broadly representative of the social, economic, linguistic and racial populations, geographic areas of the health service area, and major purchasers of health care."[3] 42 U.S.C. § 300l -1(b)(3)(C)(i); 42 CFR 122.109(f)(1). Plaintiffs' Counts I and II concern the alleged under-representation of low income consumers. Plaintiffs also insisted, in Counts III and IV, that the Board's method of selection violated the purposes and provisions of the Planning Act and, in the alternative, that the Planning Act was unconstitutional.
 
 
 5
 The parties entered into a Stipulation and Agreed Order which enjoined HSA from entering into any contracts or making any grants for health planning. The Order did grant HSA the permission to continue carrying on its day-to-day activities. Plaintiffs then filed a Motion for Partial Summary Judgment on Counts I and II, which the court granted. HSA and HEW have both perfected their appeals from this Order completely enjoining HSA from all operations.
 
 
 6
 Four issues are paramount. First, there are jurisdictional problems with regard to the federal (HEW) and private (HSA) defendants. Second, both appellants argue that the District Court erroneously construed the Planning Act to require that a representative of a particular economic stratum have an income which is the same as that of his constituency. Third, the appellants argue that the District Court ignored genuine issues of material fact. Finally, HEW in particular argues that the District Court utilized the wrong standard to review the Secretary's decision.
 
 I.
 
 7
 A. Jurisdiction over HEW. The recent amendment to 28 U.S.C. § 1331(a) removes the amount-in-controversy requirement in suits to review federal agency action.[4] Not surprisingly, HEW declines to argue the jurisdictional point, conceding that the District Court could obtain jurisdiction over it. The Northern District of New York recently reached the same conclusion in a case with similar facts. Aldamuy v. Pirro, 436 F.Supp. 1005 (N.D.N.Y.1977) (Civ. # 76-CV-204).[5]
 
 
 8
 B. Jurisdiction over HSA. The amendment to 28 U.S.C. § 1331(a) removes the amount-in-controversy requirement as to the federal defendant but it has no effect on the HSA. The appellees argue that we can obtain jurisdiction over the HSA by using § 1331(a) and exercising pendent jurisdiction. Since the action is against the United States, the pendent jurisdiction doctrines allegedly permit joinder of non-federal defendants. Appellees argue to no avail. The HSA may not be brought into the suit as pendent parties unless an independent basis of jurisdiction over it exists. See Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).
 
 
 9
 Appellees cannot satisfy the amount-in-controversy requirement. They have not offered any evidence of potential or direct injury to themselves, beyond merely pointing out that the HSA has received funds totalling $771,535 from HEW and will probably receive millions of dollars within the next several years. Surely a plaintiff cannot satisfy the jurisdictional amount any time a private defendant's annual budget exceeds $10,000. See Aldamuy, supra; Carman v. Richardson, 357 F.Supp. 1148 (D.Vt.1973). In actions for injunctive and declaratory relief, the jurisdictional amount is the value of the right to be protected or the extent of the injury to be prevented. Mississippi & M.R. Co. v. Ward, 67 U.S. (2 Black) 485, 17 L.Ed. 311 (1867); Flato Realty Invs. v. City of Big Spring, 388 F.Supp. 131 (N.D.Tex.1975), aff'd without opinion, 519 F.2d 1087 (5 Cir. 1975); 14 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3708.[6]
 
 
 10
 Plaintiffs do not seek the permanent cessation of all funds to the Texas Area 5 HSA, nor do they claim that $771,535 is excessive. Quite the contrary, plaintiffs deem themselves major beneficiaries of the funding, and demand an end to an alleged deprivation of their right of adequate representation on the Board. They seek reconstitution, not abolition. Their object is not direct participation in the budget, but the right to adequate representation on the Board and Committee, specifically that the Board have more members with incomes less than $10,000. The injury to each individual plaintiff,[7] even if we could reduce it to a monetary standard, would be small indeed. Since each plaintiff's claim is separate and distinct, each must rest on its own independent jurisdictional amount. Plaintiffs cannot aggregate them. Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); Clark v. Gray, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939).
 
 
 11
 In fact, plaintiffs cannot reduce such a speculative benefit to a monetary standard, so there is no pecuniary amount in controversy. See, e. g., Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Amen v. City of Dearborn, 532 F.2d 554 (6 Cir. 1976); Senate Select Committee on Presidential Campaign Activities v. Nixon, 366 F.Supp. 51 (D.C.D.C.1973). Plaintiffs admit that the injury they complain of is not that any specific decisions of the HSA will be altered, but that they have suffered a denial of "representational rights" granted by 42 U.S.C. § 300l -1(b)(3). (R. 219). A monetary standard requires an injury far less conjectural and speculative than this alleged dilution of representation on an HSA Board. Plaintiffs failed to demonstrate even an approximate dollar value of the relief sought or alleged injury. That failure is no surprise, since such a task would be impossible. Even if a dollar figure could be placed on representational rights on an HSA Board, the amount would be insignificant.[8] On the basis of the record, the District Court committed clear error in holding that the jurisdictional sum had been met.[9]
 
 II.
 
 12
 Appellant submits a two-pronged attack on the District Court's construction of § 300l -1(b)(3)(C)(i), since the court interpreted the provision to mean that the membership of the governing bodies must correlate with an economic and demographic study of Texas Area 5, and also that an individual must have an annual income less than the median to represent the lower economic strata. Neither interpretation is accurate.
 
 
 13
 The district court relied on a preamble to the HSA regulations to support his holding that 50 percent, with an allowable variance of up to 10%, of the Board must be persons with a family income below the median. The preamble stated that the "consumer majority should roughly approximate, in its representational aspects, the whole population of the health service area."41 Fed.Reg. 12812, 12820 (March 26, 1976).[10] We reject the notion that the terms "broadly representative" and "roughly approximate" require the application of a formula to produce a governing body whose consumer membership is evenly divided between persons whose income is below and those whose income is above the median for the area. Instead, we hold that phrases like "extreme complexity and variety," "as much discretion as legally permissible," and "does not necessitate an equal proportion," all also found in the same preamble,[11] demonstrate beyond cavil that the Secretary is encouraging, not a rigid formula, but broad community representation so that the Board will invariably consider the needs of diverse groups in the community. Certainly the health needs of our low income citizens are crucial, and undeniably the HSA's must listen to their voices. Nowhere, however, does Congress or the Secretary state that the membership on the Board has to conform directly to the demographic break-down of the area population.
 
 
 14
 Nor does Congress or the Secretary insist that an individual must have an income equal to that of the constituency he or she represents. Indeed, the proposed "Draft Guidelines Covering Governing Bodies for Health Systems Agencies" (October, 1976) circulated by HEW, listed a wide variety of useful skills for governing body members, including inter alia, experience on deliberative bodies and in leading meetings, skill in communicating with a variety of community groups, demonstrated ability to negotiate and mediate, understanding and appreciation of different perspectives in the community, credibility with community groups, legal training and experience.[12] In other words, income level is but one factor, albeit perhaps the most important one, in determining who may best represent a particular consumer group, be it low-income or otherwise. A number of elements create the most articulate champions of low-income consumers, and application of a rigid demographic formula could conceivably even thwart the most effective expression and advocacy of the interests of all segments of the consumer population of a health service area.[13]
 
 III.
 
 15
 The District Court entertained no evidence before determining that only persons with incomes below the median could represent low-income consumers, and holding that low-income consumer representation was inadequate. Admittedly, HEW created problems for itself with its reply to an interrogatory asking the names of members who are representative of low income consumers. HEW responded by listing four Board members, one of whom was a provider, whose incomes were under $10,000. (R. 395).
 
 
 16
 In its brief, HEW admits that it phrased the answer poorly, and explains that it attempted to identify those Board members who fall into the low income category. The HEW did not intend to list all persons who represent low income consumers on the Board, nor did it intend to admit that the Board is not "broadly representative." (Brief at 23-24). Whether or not HEW's response was an honest mistake or poor articulation, no one can deny that the HEW took the position throughout the proceedings and in the District Court that there is no requirement that low income consumer representatives have low incomes. It is also of record that HEW denied plaintiffs' allegation that the Board was not broadly representative of the low and moderate income consumers of Texas Area 5. (HEW Answer to P 14 of the Complaint).
 
 
 17
 HEW also relies on the HSA's response to the same interrogatory. Although we have found that the court has no jurisdiction over the HSA, the District Court considered the HSA's answers and yet ignored their import. The HSA identified some 29 members of the Board whom they deemed representative of low and moderate income consumers. In its answer, the HSA listed five criteria which it used in selecting the membership of the Board.[14]
 
 
 18
 These 29 members all had been selected on the basis of one or more of the criteria. Some of the criteria would seem to insure representation of groups overlapping with but not congruent to the low income consumer segment of the population (minorities, for example), but the point is again that we do not believe that only consumers with low incomes can represent low income consumers. The trial court, by granting summary judgment, did not give defendants an adequate opportunity to demonstrate the way in which consumer members of the Board who make more than $10,000 per year may be representative of low income consumers, and to prove that the Board was "broadly representative" of the area population. The HEW had no opportunity to develop the facts which would have aided their defense of the HSA Board.
 
 
 19
 The failure to hold an evidentiary hearing is more unfortunate where, as here, the litigation involves issues of major public importance. In the words of the Supreme Court, "Judgment on issues of public moment based on such evidence (affidavits), not subject to probing by judge and opposing counsel, is apt to be treacherous." Eccles v. Peoples Bank of Lakewood Village, Ca., 333 U.S. 426, 434, 68 S.Ct. 641, 645, 92 L.Ed. 784 (1948). See also Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); Sinderman v. Perry, 430 F.2d 939 (5 Cir., 1970), aff'd, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The HSA's around the country form the foundation of a major new federal health planning program. This litigation involves judicial construction of statutory requirements concerning the membership of HSA's governing bodies, and judicial intrusion into the administrative realm. The result here will set precedent for the plight of all HSA's, and could have a major effect on the national health plan. Courts must make certain that conclusions in cases involving important public questions rest on definite factual foundations. The conclusions in the instant case do not.
 
 IV.
 
 20
 One of the strongest holdings of Aldamuy, supra, concerns the appropriate standard of review. There, the court held unequivocally that it had to find that the HEW Secretary's decision to approve the Board of an HSA was arbitrary, capricious, or an abuse of discretion before overturning it. It is not enough that one could take issue with the Secretary's decision, or that one feels other individuals might better represent certain concerns. The Secretary must balance a large number of factors in approving an HSA, and its judgment is entitled to some deference. HEW has the expertise in the health planning field. The courts do not. See also U. S. v. Shimer, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961).
 
 
 21
 Texas Acorn attempts to distinguish Aldamuy, and certainly it and the instant case are not identical. The dispute in Aldamuy was between various groups of blacks, who disagreed with each other as to which blacks would truly represent blacks. The complainants insisted that the minority members of the Board of the Central New York HSA did not really represent the minority community.[15]
 
 
 22
 Numerically, however, minorities were, if anything, overrepresented on the Board.[16]
 
 
 23
 Although the situations are different, the Secretary in either case has a similar task of attempting to juggle numerous demographic factors and policy concerns. The Secretary must ascertain that the Board includes a proper balance of providers and consumers, and that the membership roughly reflects the population distribution of the various counties in the health service area 19 counties in Texas Area 5. The membership must include elected public officials and other representatives of governmental authorities. A certain percentage of non-metropolitan individuals must be on the Board. 42 U.S.C. § 300l -1(b)(C). The Secretary's approval is, in effect, an accommodation of policy alternatives. We find that the proper standard is whether the Secretary's action was arbitrary, capricious or an abuse of discretion. We instruct the trial court to try the case in light of that standard.
 
 
 24
 Vacated and remanded for an evidentiary hearing in accord with this opinion.[17]
 
 
 
 [1]
 A direct predecessor of the Planning Act was the Hospital Survey and Construction (Hill-Burton) Act, 42 U.S.C. §§ 291 et seq. It provided for federal loans and subsidies for the renovation and construction of health facilities
 
 
 [2]
 The statutory scheme actually envisions a three-tiered system. The health systems agency is the organization directly responsible for the development and implementation of health planning at the local level, and for the coordination of national, state, and local health planning. There is a statewide health planning and developing agency (SHPDA) responsible for health planning at the state level. Finally, the Statewide Health Coordinating Councils (SHCC) prepare final state health plans and advise the SHPDA's
 When competing entities vied for the privilege of acting as the Texas Area 5 Health Systems Agency, the Governor of Texas appointed a committee to seek a compromise. HEW had no role in choosing between the competing entities. Rather, it merely approved the application of the compromise group. The HSA received its initial funding from HEW shortly after designation in September, 1976.
 
 
 [3]
 42 U.S.C. § 300l -1(b)(3)(C)(i) provides in full:
 The membership of the governing body and the executive committee (if any) of an agency shall meet the following requirements: (i) a majority (but not more than 60 per centum of the members) shall be residents of the health service area served by the entity who are consumers of health care and who are not (nor within the twelve months preceding appointment been) providers of health care and who are broadly representative of the social, economic, linguistic and racial populations, geographic areas of the health service area, and major purchase of health care.
 Section ii further provides that the remaining members shall be providers representing physicians, nurses, health care institutions, health care insurers, health professional schools, and the allied health professions.
 
 
 [4]
 28 U.S.C. § 1331(a), as amended, provides:
 The District Courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.
 
 
 [5]
 The Aldamuy court also notes that the Administrative Procedure Act, 5 U.S.C. §§ 701-06 governs judicial review of the Secretary's approval of the HSA. While that Act does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action, Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the plaintiffs here key their complaint to a specific statutory mandate: 42 U.S.C. § 300l -1(b)(3) (C)(i). Unlike the provision of the Social Security Act that barred judicial review in Califano, 42 U.S.C. § 405(g), the National Health Planning and Resources Development Act does not preclude judicial review. The Supreme Court in Califano noted that "the obvious effect of this modification (amendment to 28 U.S.C. § 1331(a) removing amount-in-controversy requirement), subject only to preclusion-of-review statutes created or retained by Congress, is to confer jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional prerequisite." Califano, supra, 430 U.S. at 105-106, 97 S.Ct. at 984. See also Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review of administrative action); Aldamuy v. Pirro, supra
 
 
 [6]
 This is a general rule, applicable to other causes of action as well. See, e. g., Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); Kimball v. Callahan, 493 F.2d 564 (9 Cir., 1974), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974); Waller v. Professional Ins. Corp., 296 F.2d 545 (5 Cir., 1961)
 
 
 [7]
 Texas Acorn asserts that it is an unincorporated association with state-wide membership composed of Texas residents with low to moderate family income levels. At least 1500 families are members. (R. 395)
 
 
 [8]
 Though perhaps valuable, representational rights on an HSA Board of Directors certainly do not rise to the level of a constitutional guarantee. Yet even in cases where fundamental constitutional rights are at stake, satisfaction of the amount in controversy is a prerequisite to jurisdiction under § 1331. See, e. g., Lynch v. Household Fin. Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972)
 
 
 [9]
 We wonder whether this point has much ultimate significance. Surely the HSA would be seeking to intervene, were the litigation to continue against HEW without it
 
 
 [10]
 The preamble states in full:
 Recognizing the extreme complexity and variety in designated health service areas, the Department wishes, at this stage, to give as much discretion as legally permissible to health systems agencies. The Department does state that in its view although the term "broadly representative" does not necessitate an equal proportion, it does indicate that the consumer majority should roughly approximate, in its representational aspects, the whole population of the health service area.
 
 
 [11]
 See n. 10, supra
 
 
 [12]
 R. 133. See also Report of Committee on Interstate and Foreign Commerce's first annual review of the Planning Act, which stated:
 This ("broadly representative" requirement) has led to expectable debate over whether adequate representation has been given to poor people, rural areas, women and so forth. Here there is a need in the future to strike a difficult balance between assuring, on the one hand, that all parties are adequately represented and requiring, on the other hand, representation so rigidly proportional to various people's proportion of the population that the process is paralyzed by the requirements. H.R.REP.NO.95-116, 95th Cong., 1st Sess. 12 (March 26, 1977).
 
 
 [13]
 A recent Conference Committee Report buttresses our conclusion that the income and representation guidelines are flexible ones. The Report, which concerns amendments to the Public Health Service Act under HR 49-75, states in pertinent part as follows:
 "The conferees also wish to clarify the original intent of the Health Planning and Resources Development Act with respect to the composition of governing bodies of health systems agencies. * * * In particular, it was not the intent of Congress . . . to mandate a quota system requiring the selection of representatives of a particular category strictly proportionate to its representation in the population of the area or to require that representatives of a category be members of the class they represent. Instead, the Congress intended that . . . health systems agencies have the flexibility to adopt selection processes most appropriate to local needs."
 Congressional Record, H 7121, at H 7127 (July 14, 1977).
 
 
 [14]
 The five criteria included: "income of less than $15,000; a member of an ethnic minority; a public official or employee of a Federal agency; a representative designated by the coalition of community action agencies which formed a part of the compromise application; and representatives of consumer and other groups." (R. 335)
 
 
 [15]
 Plaintiffs also claimed that no one on the Board represented the inner city, and that the presence of government officials on the Board was a subterfuge. The statute negates the arguments. It nowhere requires inner city representation, and indeed, the only geographic area specifically mentioned is the non-metropolitan. Further, the statute mandates that the Board include public elected officials and other representatives of governmental authorities. 42 U.S.C. § 300l -1(b)(3)(C)(iii)(I) and (II)
 
 
 [16]
 Though only 3.1% of the Central New York Area is non-white, 14% of the consumer members of the Board were non-white
 
 
 [17]
 At oral argument, HEW requested that we remand and order the trial court to wait for forthcoming HEW Regulations and an express administrative determination of whether the Texas Area 5 HSA is in compliance with them. Both the HSA and Texas Acorn opposed that course of action, and we concur. HEW could not say with any certainty when the Secretary would issue the Regulations, and we consider the issues too important to countenance waiting indefinitely. If the Regulations mandate a dramatic change, either the lower court or this court can deal with them at the appropriate time